Good afternoon. Well, we are here on an appeal from the denial of a petition for rid of habeas corpus by a death row inmate. And before we begin, I'd like to welcome Judge Mori to the 11th Circuit. Judge Fumiya Mori is on the Nagoya District Court in Japan. And he's here pursuant to a judicial exchange program and came all the way from Japan and sitting in on various judicial proceedings. So, Judge, welcome to Atlanta and welcome to the 11th Circuit. And so I see that the counsel are ready to proceed. This is Scotty Morrow v. Georgia. And Ms. Benton is here for Mr. Morrow. Ms. Graham is here for the State of Georgia. And Ms. Benton, you may begin. Good afternoon. May I please report? My name is Jill Benton, and I'm here on behalf of the appellant in this case, Scotty Morrow. The state court that heard the evidence found that as a second grader, Scotty Morrow was repeatedly raped in the basement of the home where he lived. He was seven. That little boy could neither escape nor cope with the consequences of being sexually assaulted because there were no caring adults available to him. The other children in the home beat him up, tormented him. The other children at school, which is normally a safe place for sexually assaulted children, also bullied and teased him. As the state court found, he was chased home from school by those bullies every day. As one expert observed for seven-year-old Scotty Morrow, there was no refuge. Can I ask you a quick question? So what do you do with the line of cases that we've got beginning before Wiggins but running through and past Wiggins that basically say time and time again that when the petitioner or his family members don't mention, that's the language in the cases, don't mention the sexual abuse, then the lawyer can't be found ineffective for having failed to investigate it? Well, a couple of things there. Let's parse that out a little bit. The client didn't deny it, which is the case in some of those cases. What the Georgia Supreme Court finds is that he didn't reveal it. There's clear testimony in this record that if the very expert, the trauma expert that trial counsel had retained had been given the information that an adequate background investigation would have uncovered, that expert would have gotten the evidence of sexual abuse. Mr. Morrow was not actively denying or covering up that abuse. Well, so that's fine. I'm sorry. Wow, that's loud. So, but the cases, I mean, so just to read you from Stewart, I mean, it says, you know, when a petitioner or a family member, the petitioner directs his lawyer to talk to, does not mention a history of physical abuse, the lawyer is not ineffective for failing to discover it. So it's not about active denial. It's just did he mention it or didn't he? A couple of things. This family and this client mentioned violence and instability and abuse over and over and over again, and trial counsel did not explore the full extent of it. As to the sexual abuse, I think that you bringing up the Wiggins case is particularly instructive here. In that case where you have Wiggins self-disclosure to a social worker who's retained by post-conviction counsel of multiple instances of sexual violence in his childhood, Wiggins is, the evidence presented at trial is that Wiggins is a serial liar, that he's lied about his criminal history, he has lied about his aspects of his crime. And yet the U.S. Supreme Court says that evidence is powerful evidence in mitigation, even with the credibility problems that Wiggins has, that self-disclosure, and moreover, that trial counsel was unreasonable and deficient in failing to, on the basis of the minimal red flags they had in front of them, failing to follow up to get to the point of that disclosure. Our case tracks that pretty precisely. But have you gotten beyond, I mean, I guess, Stewart, have you gotten beyond Stewart that says, or he fails, or either he or one of his family members fails to mention the abuse that you think is the linchpin here, which is the sexual abuse, then the counsel can't be deemed ineffective for having failed to investigate it. And then further here, at least the Georgia Supreme Court, at least to me, seems to have said that there was a question. You know, the trial counsel testified, I think this is in the habeas court decision below, the federal habeas court decision below. Trial counsel testified, that's the sort of question I would have asked. The Georgia Supreme Court likewise finds that he was asked and must have said no. And isn't that a 2254E kind of finding that we have to defer to? There's a couple of different issues here, one being the district court orders finding that Mr. Walker testified that he would have asked and probably gotten a no. The Georgia Supreme Court decision just says he did not reveal it. Well, is that right? So the quote I'm reading out of my note says, however, we note that Morrow never reported any such rape pretrial to his counsel or to the mental health experts who questioned him about his background, including his sexual history. I got you. So they asked him, he said no. That reference, I believe, is to Dr. Davis, who did the early screening for competency and IQ. Dr. Davis's report includes... It says to his counsel or to the mental health experts. Or to the mental health experts. Right. So to ask the mental health experts, they talk about his sexual history with women. In other words, his adult sexual history. And there's some information in Dr. Davis's report where he's talking about his history of relationships with women, which is particularly salient here. There's no evidence that Dr. Davis asked him specifically, were you sexually abused? Dr. Buchanan says, no, I didn't explore that with him, but I would have if I had known anything about his history, particularly some of these markers of sexual abuse. What about the Superior Court, what is it, of Butts County? I read the opinion, and the judge seems to suggest that there may have been some, I think he uses the word red flags, with respect to the abuse that took place in New York and New Jersey. There were some leads, and that counsel just failed to pursue those leads. Now, is that what you are relying upon primarily, principally, in support of your argument that he was denied the effective assistance of counsel? Absolutely. There are things here that reasonable counsel would have inquired further about. Inquiring further about those things may not have led to some other witness revealing the sexual abuse, because no one else was privy to the information about the sexual abuse but Mr. Morrow and his assailant. But it would have led to a lot of other information that would have allowed the mental health expert to get there. And in fact, the unrebutted testimony of the mental health expert is, I would have gotten there. He wasn't deliberately hiding anything. He just had no insight. He was emotionally completely shut down. He was overwhelmed with remorse and shame about the crime. And so he was difficult to draw out, but he was not uncooperative. And if I had really known what to explore and the timeframe around which to explore it, I would have gotten there. Now, as to the red flags about their lives in the New York and New Jersey area, certainly they had many. There is trial testimony that at some point one of the mother's boyfriends is coming after her and Mr. Morrow has to defend her with a baseball bat and that the man laughs at him. Trial counsel doesn't know so much as that man's name. They didn't ask, did this boyfriend live with you? How long did your mother date him? Were they married? What was he like? And most essentially, was he ever violent to anyone else, including Mr. Morrow? None of those questions get asked. Those are pretty basic questions that once you hear about another violent man in this family's life. How much can we take into consideration the superior court's decision? It was a pretty long and thorough and comprehensive opinion. How much of that can we take into consideration when we have the Georgia Supreme Court's decision, which pretty much just contradicts everything the superior court says? How do you get around a deference? How do you get around that? The Georgia Supreme Court says that it is adopting the findings of fact of that superior court. It does not explicitly say that we are reversing one of those findings of fact because they're unsupported by the evidence. Everything that's a finding of fact in that order is in front of this court undisturbed and supported by the evidence. Do I remember though correctly, and please feel free to correct me if I've got this wrong, that the Georgia Supreme Court says something like we're adopting the findings of fact except where we conclude to the contrary or something like that? They never conclude to the contrary. Well, insofar as their conclusions would be there was no ineffective assistance of counsel and that's incompatible with the finding of the state habeas trial court, then we'd have to read that as being to the contrary, wouldn't we? Well, that's an application of the clearly established law to the facts that were found. They're concluding that what trial counsel did wasn't… Federal law, I don't understand that. I'm saying that what the Georgia Supreme Court did was unreasonably apply the federal law to the facts. That's where it parted ways with the superior court is in its findings with respect to the way the law applied. It adopted, for instance, what the superior court found that trial counsel did and did not do. It adopted what the trial court, at least on the face of the order, what the trial court said was the mitigation evidence. So can I ask you about a couple of what seemed to me to be factual assertions at least in the Georgia Supreme Court's decision? You can tell me whether you agree or disagree with these. So one, trial counsel met repeatedly with Morrow, his mother, and his sister. True? The superior court says that they did meet with them repeatedly, but most of that contact was non-substantive updates about the status of the case. Okay, so two, counsel discussed Morrow's childhood background with them extensively. True? This is what the Georgia Supreme Court says. This case doesn't turn on whether it was extensive or not. They discussed his background with them, whether or not you could call it extensive when they don't know what happened during a 13-year period in the client's life is up for debate. What is not up for debate is whether or not that is a proper place to stop pursuant to Strickland. Okay, so then the third, and I think sort of the most pointed, going back to a question I asked you earlier, Morrow presented evidence in the habeas court, the state habeas court, suggesting that he had been raped by his cousin as a child. However, we note that Morrow never reported any such rapes pretrial to counsel or to the mental health experts who questioned him about his background, including his sexual history. True? The state habeas court found those rapes happened. If the Georgia Supreme Court says that not one of any 12 reasonable jurors would have been persuaded by the evidence of rapes that the superior court finds happened based on the evidence in front of them, that is an unreasonable application of Wiggins, Porter, Strickland. I guess my point is not so much whether the rapes happened or didn't happen, awful if they happened, but whether counsel was ineffective for having failed to find them. And here the Georgia Supreme Court says the state habeas court found that they happened. However, we note that trial counsel discussed this period of history, of his history with Morrow and his family and talked to them about the sexual history, and he said nothing. Let me briefly go back to trial counsel talking to him about his sexual history and that quote from Mr. Walker about, I'm sure I would have asked about that at some point. That piece of the testimony, he's discussing his conversations with Mrs. Bowles and Samantha, the client's sister. And so if he had asked one of those two women, they would not have known about the sexual abuse. So he says, oh, I'm sure that's something I would have asked about and probably, probably gotten a no. That's the quote from Mr. Walker. But more to your point, what trial counsel didn't do was go collect the evidence that their experts needed. I'm reading his testimony. That is the type of question that I'm sure I would have asked of his family or of him. And probably gotten a no. But the testimony above is him talking with Samantha and the testimony says him to probably gotten a no. In any event, the Georgia Supreme Court says that he didn't reveal it, not that he was asked and failed to disclose. And then even if that is so, although I think, frankly, there's a debate. There could be a debate about what the Georgia Supreme Court actually concluded. How does that get you beyond Stewart, Callahan, Chandler, Williams, all of these cases, pre Wiggins, post Wiggins, that say where he or his family members failed to mention it, counsel can't be deemed ineffective. I mean, we can have a debate about whether he whether he affirmatively rejected the suggestion that this happened. I think the Georgia Supreme Court may be suggesting that he did. But whether that's true or not, our case law doesn't require so much. Our case law says, did he mention it or didn't he? And if he didn't, trial counsel can't be deemed ineffective. But trial counsel can be deemed ineffective for not asking the obvious follow up questions of Mr. Morrow and his family when they reveal that they're living in unstable and violent conditions surrounded by people who are violent. When they know that mom has a history of choosing unsavory and violent partners and bringing them into the home. The idea that they didn't ask anything about their living situation in New York or New Jersey or or identify a single other witness in New York or New Jersey to give them that information is where the deficiency lies. Not with Mr. Morrow. If the mental health expert had that information, knew about his adjustment problems in the second grade, knew his living conditions, knew that he began wetting the bed suddenly as a seven year old with no prior history of that and then wet the bed thereafter for the remainder of his childhood. The unrebutted testimony is that that mental health expert would have known to explore sexual abuse and that he would have gotten it from Mr. Morrow. And we know that because that's precisely what happened in post conviction is that we armed appropriately qualified expert in trauma with the information we knew and said, what do you think? And he asked Mr. Morrow about his time in that house in New York. There is no reason to think that trial counsel wouldn't have proceeded the same. What is an unreasonable is them not knowing about sexual abuse. What's unreasonable is them not knowing really anything about his time in New York and New Jersey, which he would have known had he hired Dr. Buchanan initially. Well, if he had hired Dr. Buchanan earlier, certainly that is one of the factors here. But but I think more problematic is they don't give Dr. Buchanan any sources. They are, by their own admission, giving him a client who is emotionally shut down, who can't talk about his own background or the crime is limited and has to be drawn out. That's part of Dr. Buchanan's task is drawing out his emotionally. And they give him no other source of information besides the client who they know is having these difficulties. They don't have him talk to a single other witness. They give him no other witness statements, no single record about Mr. Morris background, no school records. They give him only information about the crime. It's amazing that Dr. Buchanan got as far as he did, you know, to say, oh, here, kind of figure out my client. Oh, and by the way, also counsel him to be a good witness in his own defense. And you have, you know, a month to do it. You know, Dr. Buchanan is first retained and does the initial testing and the intake interview on March 29th. It is not until May 17th that he gets a chance to dig in with this client. His first substantive discussions with Dr. Buchanan are on May 17th with a trial that starts the first Monday in June. Even if Dr. Buchanan had had found out something, in fact, Dr. Buchanan finds out that there's this other abusive boyfriend in New Jersey. Trial counsel says you have two months. Do what you can. Like, you know, the trial is coming. And Dr. Buchanan's testimony is I knew that we we needed more. The trial lawyers knew that we needed more. And if I had had more time, I would have said I need his past history. But that wasn't an option under the circumstances. And that's unreasonable under Strickland. Can you, I guess, pivot to your prejudice point to explain to us how exactly this discovery, this investigation, or lack thereof, prejudiced your client? Absolutely. What's the sort of the theory of prejudice here? What would it have done to the case? Well, what it would have done is given trial counsel the support for the theory they put forward, you know, just as in the Farrell case. Trial counsel here explicitly raised for the jury the question looming over this entire case, which is why did this happen? We have this mountain of evidence that this is an otherwise nice, affable guy, that he's responsible, that he has all of these great qualities. So how was it that he was so provoked by these? You know, why did this happen? That was what they flagged for the jury and yet didn't answer that question. The notion that he was sexually assaulted as a seven-year-old and then from there moved into the home of Judge Wilson, shall I? Okay. That he was then moved into the home of someone who is beating him while he's naked. And the confusion and dysregulation that that caused, the problems in interpersonal relationships that that caused, his inability to navigate a successful relationship as Dr. Buchanan testified to. In Porter v. McCollum, the U.S. Supreme Court says this kind of childhood has particular salience. That's the Supreme Court's language, particular salience with respect to the defendant's treatment of a victim. Meaning in Porter it's, as in Mr. Morrow's case, his ex-girlfriend who is the victim and his abusive behavior leading up to the crime, that this informs the jury's evaluation. Porter was 54 years old. So just so I understand, I mean like how exactly does it inform the jury's evaluation? Is that because it sort of feeds, as you said, the sort of snapped theory? So I guess here's the difficulty I have with that and I'm interested in what you have to say about it. I mean there is a snapped theory, I suppose, but then he did kill not just one person but two plus a half, an attempted third. There's evidence, I think, that he either reloaded or cleared a jam in his gun. He severed the wires of the house when he left. That just doesn't sound like snapping to me. Well, there are certainly aggravating circumstances in this case. And once he was unhinged, certainly more aggravation accrues. That, in light of the clearly established Supreme Court law, doesn't necessarily preclude a finding of prejudice. In fact, the same finding of prejudice that was made in Porter is appropriate here. In fact, it was required here and it was unreasonable to find anything else. Porter's case, in many ways, was more aggravated than Mr. Morrow's. His crime was more premeditated. He was stalking the victim. He, too, killed a second person who was there with his girlfriend. You make the argument in your brief that maybe his theory of defense would have been supported had counsel retained a forensic science expert. You haven't talked too much about that. That seems, at least to me, to be probably your strongest argument. Do you want to address that? Well, are you talking about a forensic social worker or the forensic crime scene specialist? Forensic expert. What the forensic crime scene expert could have done was allow trial counsel to show that Mr. Morrow's account of the crime, which they put him on the stand to explain the provocation, at every turn the DA impeached what Mr. Morrow said happened during the crime with evidence from their own crime scene examiner, saying, no, the physical evidence shows that you had to have done this more aggravated thing, not this less aggravated thing that you're saying that you've done. The evidence shows that Ms. Woods was seated at the table passively, not standing up, like you say. The evidence shows that you pistol whipped and beat Ms. Young around the head. You deny that. If trial counsel had gotten a forensic crime scene expert, a forensic expert of any kind, they could have argued, no, his account of the crime is supported by the physical evidence. And the reason that matters here is because such a big piece of their argument was that Mr. Morrow's remorse is overwhelming, that he's accepted complete responsibility for this crime, that he is not shirking any responsibility for the things that he's done. Although his trial counsel said that his cross-examination was a disaster and that his remorse and shame did not come through. Everyone says that his cross-examination was a disaster, even Dr. Buchanan, that all of the things they feared about Mr. Morrow's emotional flat affect happened. And that you could have had an expert who testified to some of the things that Mr. Morrow, that they put Mr. Morrow up for. What did the Superior Court of Butts County say about that? I thought the Superior Court said that had counsel retained a mental health expert who had knowledge about his background, that mental health expert would have been able to explain why he appeared cold and remorseless when he testified. Is that in the record? That is in the record. Dr. Buchanan says, I could have explained that to the jury. I could have explained a long-term pattern of emotional detachment because he just can't handle it. And sexually abused children, physically abused children learn very early on to dissociate, then it becomes imbued, and they can't make it not happen when they're overwhelmed by emotion. Failure to retain a mental health expert is not an issue before us. They retained an appropriate expert. They just hamstrung that expert with too little time and too little information. I see that my time is up. I think we have your argument, and you've reserved some time, Ms. Benton. And we'll hear from Ms. Graham. Thank you. Thank you. My name is Sabrina Graham. I'm here on behalf of the respondent. I'd like to go over a couple of things that the court questioned about the crime scene. Ms. Benton stated that at the time of the crime and at trial, that the state had argued that Tanya Woods was seating instead of standing, and that that would have supported, if they put up their own, if Petitioner put up his new forensic expert, that would have supported their theory that she was instead standing. But that wasn't a point of real contention there at trial. And, in fact, Latoya Horn testified that Ms. Woods fell over in the chair. I don't think there was any specific testimony that she was seated or standing. So that wasn't a real point of contention. And whether she was standing or seating, she was unarmed, and his forensic expert and state habeas does not prove that she did anything that was aggressive towards Petitioner to cause him to pull his weapon and shoot her. Regarding Ms. Woods, him chasing her down the hallway, and whether or not he actually took her head and slammed it into the door frame, or whether or not he shot her in the hand, as his state habeas expert testified, and that bullet grazed off her head and went into the ceiling, I mean, again, that's not mitigating, and it doesn't support the theory that what he said was true or not. So I'd like to point that out to begin with. The Superior Court of Butts County disagrees with you. The judge who conducted the evidence you're hearing disagrees with everything you've said. I agree, Judge Wilson, but I will say this. That was all on a cold record. There were no live witnesses regarding that particular information, and the Georgia Supreme Court then reviewed that information and said, you know, we're looking at it even assuming that their crime scene expert is telling the truth. We still find that you haven't shown prejudice here. Can I ask you, I guess, the same series of questions that I asked your adversary about sort of factual assertions in the Georgia Supreme Court's opinion and to what extent those are entitled to 2254E treatment? So the first, and I'll just, you know, they're all the same ones. Trial counsel met repeatedly with Morrow's mother and sister. Counsel discussed Morrow's childhood background with him extensively. Morrow presented evidence in the habeas court suggesting that he had been raped by his cousin as a child. However, we note that Morrow never reported such rapes pretrial to his counsel or to the mental health experts who questioned him about his background, including his sexual history. Are those 2254E statements? I would say absolutely, yes, they are. I understand that the Georgia Supreme Court stated that it was adopting the findings of fact of the state habeas court unless they were clearly erroneous. Now, while the Georgia Supreme Court didn't specifically say we find this to be clearly erroneous, certainly in their findings it suggests that they did. And in this particular instance, certainly, yes, trial counsel did discuss with Petitioner and his family his background. And I know that it's been stated that Dr. Buchanan did not ask Petitioner about the sexual abuse, but I did not read Dr. Buchanan's testimony in that manner. I read it in the manner that he stated, well, if I'd been able to confront him with a specific incident of him being sexually abused, then maybe he would have told me. But he did not state, Dr. Buchanan did not testify that he did not question Petitioner about sexual abuse. I guess one of the problems that I have with this case is when I read the Georgia Supreme Court's opinion, I see facts in that opinion that are inconsistent with facts determined by the Superior Court of Butts County. So if I go look at the record myself and I see that there's an unreasonable determination of the facts by the Georgia Supreme Court, that's a, a deference can be overcome, can't it? Sure, yes, if you did find that, yes. Has there been an argument that there's been an unreasonable determination of the facts? Yes, I do believe that they make several arguments. What's the unreasonable determination of fact? I think one of the arguments was regarding the sexual abuse. And in the Georgia Supreme Court's opinion, they state that, you know, Petitioner only informed trial counsel, did not inform trial counsel of the sexual abuse, and this did not come out until State habeas. And they explained in their opinion when they were looking at it under the reasonable probability of a different outcome that the jury would not have given as much weight to that information. So they did a mixed, you know, I think it was fact and law analysis there. And they dispute that saying that there was evidence corroborating it in the fact that he had wet the bed and he had trouble in school. Therefore, they should have abided by, the Georgia Supreme Court should have abided by the State habeas court's credibility determination. But the Georgia Supreme Court did not state that it was not finding that it wasn't credible. It just said it would not have given it the same amount of weight that Petitioner was advocating for. That was one of the instances, I think, they said was. But insofar as counsel questioning his client and family about his background and sexual history, is there an argument that that was an unreasonable determination of fact? I do not see that as an unreasonable determination. There is certainly fair support. Is there an argument that there was an unreasonable determination of fact? I didn't remember there being one. I don't think there is, but I could be wrong. There were several arguments. And if that's true, that that was asked, then that's the end of that claim, isn't it? I would certainly agree that it is. As long as they have. If the question was asked, I agree. Yes, Your Honor. And as far as I know, there was a lot of mention regarding the red flags there. Actually, the Georgia Supreme Court made finding, I think, a finding of fact and law regarding the two red flags. And the two red flags were that he wet the bed when he was a child, I think around the age of seven. But there's no evidence in this record that petitioner or his family told trial counsel that he wet the bed. So that's not a red flag that trial counsel would have known about. Well, that's one fact. But I'm looking at the Georgia Supreme Court's opinion on page 173. And the Georgia Supreme Court says it is simply not correct that trial counsel ignored information from the years during Marlowe's childhood when he lived in New York and New Jersey. Although we acknowledge that they relied heavily on Marlowe, his mother, and his sister to provide information about that portion of Marlowe's life. And then I go to the decision by the Superior Court of Butts County. And the Superior Court of Butts County, the judge there conducted an evidentiary hearing. And he says, there is no question that at the time of trial, counsel was unaware of the rapes, beatings, and other developmental insults that petitioner suffered while living in the New York and New Jersey area. And he goes on to say, in short, counsel knew that petitioner was raised in the New York area from the age of seven, yet did little to investigate his life there. And he says, that admission constitutes deficient performance and satisfaction of the strictest standard. And so I guess what I'm struggling with is the Georgia Supreme Court and the Superior Court of Butts County have completely different versions of the record. If I go to the record myself and look at the testimony and I see that the Superior Court of Butts County correctly states the record and the Georgia Supreme Court doesn't, I'm not required to give epidepherence to the Georgia Supreme Court, am I? Because I can make a determination that there is an unreasonable determination of the facts. Yes, Judge Wilson, that is true. Can I speak to what the Georgia Supreme Court found? They said that trial counsel did not ignore his time in the Northeast. That is a fair assessment of the record. There's no evidence that trial counsel did not question petitioner, his sister, and his mother, who both give almost all the information that they're relying upon here regarding his background in state habeas. So they did question them about that period. Ms. Graham, before you too quickly concede something in the hypothetical that Judge Wilson granted, I want to make sure I understand the law in this area. I thought that if the state trial habeas court made certain findings of fact based on a record and the state Supreme Court reversed the finding, that what AEDPA requires us to do is to review the final decision. That would be the decision of the Georgia Supreme Court. And if there's evidence to support that finding, if that's not an unreasonable finding, we have to defer to it. Even if we thought, after looking at all the record, we thought the record better supported the finding of the state habeas trial court, it's not its decision that we're really reviewing. It's the final decision of the state Supreme Court. And if there's evidence to support it, it's not an unreasonable finding, we have to defer to it. Is that not right? That is absolutely correct. And I was inarticulately trying to get to that point by saying that there was support in the record for the Georgia Supreme Court's decision. Therefore, it would have AEDPA deference. But if we look and we see there's no support for the Georgia Supreme Court's findings of fact, then we're not required to give that deference, are we? That is the standard. If by clear and convincing evidence, there is no support for the Georgia Supreme Court's factual finding. But again, that's how tough the standard is. Yes. Yes. Yes. As I was stating, though, there is support for the Georgia Supreme Court's finding. They did not ignore that particular area. I think it's fair to say that when trial counsel spoke with Petitioner and his family, and they also hired two mental health experts, the first, Dr. Davis, they sent him a letter. And it was a three-page letter. And in it, they said, can you please tell us why Petitioner committed this crime? And in it, he does go through a social history. So they did have an expert to go through the social history. And in it, I know my opposing counsel keeps stating that Petitioner didn't open up to the mental health experts. But if you look at those, if you look at the report of Dr. Davis, and if you look at the testimony of Dr. Buchanan at trial, it's clear that he did open up to these experts about his background. He wasn't closed off telling them absolutely nothing about what happened. He did. How soon after counsel was appointed to represent Mr. Morrow were these experts retained? Dr. Davis was appointed within, I think, a month or two after trial counsel was appointed. And does the record reflect when he actually evaluated Morrow? Yes. Yes, there is a report from Dr. Davis in there. That report was sealed, and the state did not have that at trial. But that is in there. It shows that. And Dr. Buchanan, yes, he was hired two months before trial. But at that time, they had spent four years with Petitioner's mother and sister who knew all of his history. And they were not giving them the type of information that suggested to counsel that they needed to go to the New York or New Jersey area and look for more information. Two months before trial, when you've been retained a representative for four years, it's not a long period of time to give him an opportunity to conduct the type of evaluation that you need to prepare for a case like this. The Georgia Supreme Court said that was plenty of time. I mean, it's two months. There's no Supreme Court precedent that states that you, any specific amount of time has to be given to the mental health expert in order to conduct a reasonable investigation. And again, Dr. Buchanan, while... And I know we look at the Georgia Supreme Court's decision, and I hate to keep going back to the Superior Court of Butts County, but Butts County disagrees with that. And we just have to ignore Butts County? Altogether, even though the record supports Butts and not the Georgia Supreme Court? But I think the record does support the Georgia Supreme Court's opinion. I haven't seen an instance here where they have made a finding of fact or conclusion of law that wasn't supported by the record. So can I ask you a quick question? And I, too, hate to be sort of a one-trick pony, but this statement in the Georgia Supreme Court's opinion that says, in effect, trial counsel asked of the question, were you sexually abused as a child? And he said no. Is there, to Judge Wilson's question, is there support in the record for that? We'll call it a finding. I'm not accustomed to thinking of appellate courts making findings, but we'll call it a finding. Is there support for that finding? Yes, there is. I think the testimony that Judge Pryor read directly supports that. Got it. Okay. So I just wanted to be clear that, I mean, that's what I thought you would say, but that is the record support for that specific finding. Yes. Okay. Thanks for nailing that down. And I'd like to go back again to the red flag. So there were only two red flags here. It was the bedwetting, which there's no evidence that trial counsel or the mental health experts were told that. Secondly, it was the fact that he had some behavioral problems in school. However, Dr. Buchanan and Patricia's mother both testified at trial that she had him evaluated and he had a learning disability, and he was in special education classes for that from, I think, I believe it was fourth to ninth grade. So they were aware that he had the behavior, but that was explained by the fact that he wasn't doing well in school because he had a learning disability. So the only two red flags there aren't glaring red flags that a lay person is going to notice in order to say to them, oh, we need to go and investigate further this line of what is not even identifiable at that point, this line of evidence. I think even if this court and I think if you look at the Georgia Supreme Court's opinion and they say, let's assume we think they did an adequate investigation, but assume there was deficiency here, we still do not find prejudice. And you can't say under Supreme Court precedent that that's an unreasonable application of Supreme Court precedent or contrary to any Supreme Court precedent. They keep analogizing their case to those of Wiggins and Rompilla and Porter, but those are extremely different. They have to be exactly the same set of facts, and you do not have that in this particular case. Yeah, one of the things I was struggling with is how that evidence would have come in. So if there was a failure on the part of trial counsel, if there was ineffective assistance, how would the evidence that counsel should have discovered come in? And as I understood it, the Georgia Supreme Court says, look, you can't use an expert to serve as a conduit for hearsay. I think, and I agree with you, that's exactly what they were relying upon their Watley case in the Georgia Supreme Court opinion. They may have been able to put it in through their mental health expert. However, I think what the Georgia Supreme Court is saying is that, yeah, we're not going to let you just get up there and testify to hearsay and assume that everything you say is correct. We're going to filter that through another, you know, because it is hearsay, and say that, well, then we can't give it maybe as great a weight. It doesn't get weighed out as much as if it come through directly. Of course, but he could have testified to it, right? I'm sorry? The client could have testified. Yes, the client could have provided the testimony, yes. But they decided during the sentencing phase that Petitioner would not testify. Yes, because his cross-examination had been a disaster in the guilt phase. Correct. And to get back to the prejudice analysis, in this particular case, when the Georgia Supreme Court looked at the actual affidavits, the evidence here of the abusive background, they did not find it that compelling. And I think when you actually look at the affidavits, you can see why that is. When you take away the exaggerations of he was beaten every day, he was bullied every day, which isn't borne out in the affidavits from the people who were in his life. When you take all of that out and that dramatization, it's not the level of abuse and neglect that you have in Wiggins, Williams, and Rompilla. What you have is a single mother who worked three jobs, and they never lacked clothing, food, or anything of that nature. So his background just wasn't as aggravated as those other cases. Of course, those cases also say, there's a ton of cases out there that say that counsel has to ask the right questions, too. I mean, you have to explain the scope of mitigating information. You've got to thoroughly sift the questions to make sure that you get the right information. And trial counsel... You've got to ask... Trial counsel has to ask the right questions in order to get the information that he needs in order to represent his client. And the Superior Court of Butts County said counsel didn't do that in this case. Well, trial counsel testified that they asked the petitioner. We said, we need to know the good and the bad. They asked them. They said they would have asked these questions. I don't know...  Correct, Your Honor. Yes. So can you respond briefly when I was asking Ms. Benton the question about sort of how exactly is it that this evidence would have been mitigating for prejudice purposes? And I think she said, you know, it would have fed the theory that he snapped. Sort of the underlying childhood abuse would have fed the theory, the trial theory that he snapped. Why doesn't that work? I don't think it provides much of an explanation for his crimes. First of all, fed the theory that he snapped supposes that a jury only believes petitioner's versions of the crime. And it doesn't believe any of the evidence presented by the state. That he abused this lady, that he called her up on the phone the day of the crime. She told him to stay away. That he came over. That her son testified not once, not twice, but I think three times that he busted in and kicked in the door. And the fact that Ms. Latoya Horn, the surviving victim, stated that only a few words were exchanged between him and Ms. Woods. And he immediately pulled out his weapon and he began shooting. And he began shooting these women and he chased Ann down the hallway and he came back and he shot them again at point blank range. He goes outside. He cuts the wires. And then he goes home. He takes his clothes off. He hides them. He takes his weapon. He wipes all the fingerprints off. And he hides that too. I don't see how the fact that he was abused ten years before provides much of an explanation for his crimes on that particular day. I don't think that it fits into that. Well, we would ask that the court affirm the district court's denial of relief. And unless this court has any other questions, I will sit down. Thank you, Ms. Graham. Thank you. Ms. Benton, you've reserved some time for rebuttal. First, just briefly with regard to prejudice and the way in which the childhood evidence explains the crime, the trial expert gives complete testimony that's credited by the state habeas court about how this childhood background explains his crime. And maybe jurors, reasonable jurors would have considered that. But you don't have to believe that this childhood evidence explains his crime or that this childhood evidence is the reason that he snapped in order to find that it's substantially mitigating. Reasonable jurors would understand that the rape of a seven-year-old, that the repetitive beating of a child over the course of his life is substantially mitigating. They probably would have understood it intuitively even without the expert. The expert carries the ball across the line, but it's mitigating in its own right. If the court doesn't have any more questions about the prejudice piece, I want to turn back to trial counsel's handling of the family, because I think that our argument has been misapprehended a bit here, both by the Georgia Supreme Court and by respondent. The bedwetting, the school adjustment problems, the other things that would have led Dr. Buchanan to ask about sexual abuse in a pointed way and gotten the information are not the red flags that we are saying that trial counsel missed. Trial counsel had ample red flags from this family that they missed, and they didn't follow up and get the information that would have led Dr. Buchanan to have the bedwetting, the school adjustment, and the other issues. For instance, they knew that their client had blackouts as a child. They didn't explore any other medical symptomology. They know he has blackouts and headaches. They don't say, did he have any other developmental problems? Did he have any developmental delay? They know that he moves around a lot once he gets to New Jersey. They don't say, why are you moving around a lot, and who are you living with? They know that there's violence in the home over the course of the client's life, and they don't go find out the details of his life in New York or New Jersey. They just leave it blank. Mr. Brownell says, we weren't even really looking in that direction, meaning New York and New Jersey. So I want to be clear that we're not saying that the bedwetting and things are the red flags. Those are not. It's trial counsel's failure to run with the information they had. And relying exclusively solely on Mrs. Bowles and Samantha Morrow, they know that it's unreasonable because they know that Mrs. Bowles is self-conscious about her role and the outcome here, that she's worried about the impact that the publicity surrounding this trial will have on her business, that she wants everything to look okay, and so she tends to minimize the impact of the bad things in their past. They testify to that. They know it. They know she's not around because she's working three jobs. And they know that Samantha Morrow is less than nine months older than their client, so she's a child herself, and yet they don't talk to a single other adult or family member who knew them while they were in New York or New Jersey. Moreover, they don't ask Mrs. Bowles and or Samantha the obvious follow-up questions. Weren't those witnesses, though, the mother and the sister, the very witnesses who later told habeas counsel what they needed to know? They're among the other witnesses. They're among the witnesses who tell habeas counsel what they need to know, and that goes to my last point, which is they're not asking the obvious and relevant follow-up questions of Samantha Morrow and Mrs. Bowles, and the reason they're not doing that is nobody on this trial team has the relevant skill set or knows how to identify and gather mitigation. Mr. Burnell is a career prosecutor. Mr. Walker has never tried a capital case to verdict. He's been involved in one or two where the death notice was withdrawn or the client entered a plea. He doesn't know. He tells the trial court in September of 1995 at the ex parte hearing on the motion for their funds that they need a social worker because he doesn't have the skills to get the mitigation. He says there's simply a need in a case like this for somebody who is trained and knows how to look for the factors that the attorneys don't know to look for that become very important in a death case. The trial court says okay and gives them the money, and for the remainder of 1995, for all of 1996, for all of 1997, for all of 1998, and for the first three months of 1999, they do nothing. They say that the reason we didn't get a social worker is because between the combination of what Mr. Muggeridge was doing and what Dr. Buchanan was doing, we thought we would cover it that way. That didn't happen until May of 1999, right before trial. That explains nothing about why you didn't employ someone. And somebody who knew to ask the right follow-up questions would have gotten at the evidence of what Mr. Muggeridge's behavior and what his living circumstances were like in New York and New Jersey. And once you get that information, then you get all of it through your expert. And that is what makes this case different to your point, Judge Newsom, than the line of cases where trial counsel asks and gets a denial. In those other cases, trial counsel is asking and getting information that either indicates that all is well or relatively unremarkable in the client's home, or is visiting the places that the client lived and talking to the relatives, and they say things were fine. Or they say, I'm not talking to you, or don't talk to this relative. That is a different thing than where you have relatives who are not even being told, because neither the investigator nor trial counsel has the relevant skills, what constitutes the full scope of mitigating evidence. You're not even being told that, who are trying their best and who are volunteering information that would lead any reasonable lawyer to keep going. And in fact, the Sixth Amendment requires it. That's the clearly established federal law. Do I recall, and again, correct me if I'm wrong, I don't have the notes in front of me, but the sister said when asked about the period in New York that it was pretty good? During her direct testimony at the guilt phase of Mr. Morrow's trial, he says, okay, so you leave your abusive father and move to New Jersey. How was that? And she says, oh, pretty good. And then she goes on to describe in a very general way where they lived. That is not consistent with either her or Mr. Morrow's earlier description of their living circumstances in New York or New Jersey. Whether she thinks that they were pretty good or not, an objective person hearing what they knew, the little they knew about New Jersey would not say, oh, it sounds pretty good. And maybe it was pretty good for Samantha. That doesn't answer the question of what it was like for Mr. Morrow, and that's the relevant question. If the Court has any further questions. I think we have your argument, Counsel. Thank you. Thank you. The Court is adjourned. All rise.